IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JANET O'MEARA,                          )
                                        )
          Plaintiff,                    )
                                        )
     v.                                 )          Civil Action No. 1:20-cv-1160 (RDA/JFA)
                                        )
CHRISTINE WORMUTH,                      )
*Secretary of the Army*,                )
                                        )
          Defendant.                    )

## **MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendant Christine Wormuth's Motion for Summary Judgment in this Rehabilitation Act and Telework Enhancement Act case. Dkt. 65. The Court dispenses with oral argument as it would not aid in the decisional process. Fed. R. Civ. P. 78(b); E.D. Va. Loc. Civ. R. 7(J).

Considering Defendant's Motion for Summary Judgment together with Defendant's Memorandum in Support (Dkt. 66), Plaintiff Janet O'Meara's Opposition (Dkt. 70), Defendant's Reply (Dkt. 74), Defendant's Supplement in Support of her Motion for Summary Judgment (Dkt. 75-1), and Plaintiff's Response in Opposition to Defendant's Supplement (Dkt. 77), it is hereby ORDERED that Defendant's Motion for Summary Judgment is GRANTED. For the reasons that follow, judgment will be entered against Plaintiff because there are no genuine issues of material fact.

## I.  BACKGROUND

### A. Factual Background

Although the parties dispute certain facts, the following facts are either undisputed or considered in the light most favorable to Plaintiff.[1]  *See Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (noting that courts must view the evidence on summary judgment in the light most favorable to the nonmoving party); *see also* Defendant's Statement of Undisputed Material Facts (Dkt. 66); Plaintiff's Disputed Material Facts (Dkt. 70).

### 1. Plaintiff's Employment

In May of 2014, Plaintiff began working for the United States Army Corps of Engineers' Principal Assistant Responsible for Contracting Winchester office ("PARC-WIN" or "employer" or "agency").  She worked as a Senior Contract Procurement Analyst at the GS-14 level, which made her one of a few analysts tasked with reviewing high-dollar contracts and ensuring that competent, qualified procurement professionals were receiving Contracting Officer Warrants.  She reviewed contracts valued up to one billion dollars.  Her official supervisor was John Teetsov, but Teetsov also designated Valerie Mills-Diggs as "team lead" for the office's six procurement analysts, Plaintiff included.

### 2. Plaintiff's Medical Condition

Since 1999, Plaintiff has existed with a mental health condition that has been diagnosed as generalized anxiety disorder, bipolar disorder, and attention deficit hyperactivity disorder.  In early 2014, before Plaintiff's employment at PARC-WIN began, she presented with "severe" symptoms

---

[1] At times, Plaintiff's Opposition attempts to create fact issues by contradicting information in the record—namely, information in her medical records—without any evidentiary basis to do so.  But Plaintiff cannot create a genuine issue of material fact with conclusory statements, and her mental health condition is not a fact in dispute.  Therefore, to the extent Plaintiff seeks to controvert these facts, Defendant's facts are deemed admitted under Local Civil Rule 56(B).

of psychosis, experienced delusions and hallucinations, and was hospitalized as a "full-time psychiatric patient." Dkt. 66-3 at 68. Plaintiff continued to experience paranoia throughout the remainder of 2014, with her healthcare providers reporting that she had "increased anxiety about her functioning at work," felt "anxious about making a mistake and being fired from the job, though in reality she has not had any evidence of that in fact," and presented with "persecutory delusions." Dkt. Nos. 66-9; 66-10; 66-11. She also described workplace dysfunction with Valerie Mills-Diggs, her team lead at PARC-WIN, reporting that Mills-Diggs was "slandering," "micromanaging," and "restricting" her. Dkt. Nos. 66-11; 66-12; 66-3. Against the advice of her physician, Plaintiff stopped taking her medications in November of 2014.

By March of 2015, Plaintiff's "psychosis reemerged in the form of paranoi[a]," with her provider stating that she "also thinks that people are talking about her." Dkt. 66-13. On March 13, 2015, Plaintiff reported to John Teetsov, her official supervisor, that she had struggled with mental health issues for about fifteen years. In turn, Teetsov sought advice from a specialist in the agency's human resources office about this conversation, also stating his own observations that Plaintiff seemed to feel persecuted by others, felt that others blamed her for their own troubles, and was unable to focus on work tasks. Plaintiff was able to keep her condition private from her other co-workers until experiencing a psychotic episode at work on March 17, 2015. That day, several of her co-workers observed her disoriented and sitting on the floor.

That same day, Plaintiff met with Command Surgeon Commander Thomas Janisko. He received her permission to discuss her care with Teetsov and recommended to Teetsov that Plaintiff's workload be temporarily suspended for the next week so that she could focus on her health. Teetsov consented to the plan, and Plaintiff returned to work. Her paranoia continued,

however, and she reported to her doctors her belief that "people want[ed] to destroy her career." Dkt. 66-14.

After the March 17, 2015 incident, Plaintiff began to experience significant conflict with Mills-Diggs. Plaintiff alleges that between March and July of 2015, she learned that Mills-Diggs was speaking in a derogatory way to others in the contracting community about Plaintiff's disorder. With no action from Teetsov on the issue, Plaintiff elected to initiate a complaint with the United States Equal Employment Opportunity Office ("EEO") on or around July 23, 2015, alleging harassment by Mills-Diggs, among other things; she later filed charges with the Equal Employment Opportunity Commission ("EEOC"). Dkt. 7 ¶ 15. On August 24, 2015, Plaintiff, Mills-Diggs, and Teetsov met with an EEO Counselor and agreed to a "situational" telework agreement that would allow up to five days of telework per week as needed.

After this transition to telework, Plaintiff complained that she was harassed and intimidated by being required to provide a status update report when she started and ended each telework day. She also presented to her doctor with increasing paranoia in September of 2015 and informed Teetsov she was "having a difficult time trying to get things done" at work and would need to take leave. With Teetsov's blessing, Plaintiff took leave on September 17, 18, and 21-25, 2015. After returning to work for two days, Plaintiff's symptoms were not improving, with her doctor noting at that time that Plaintiff experienced psychosis in the form of paranoid delusions and was "thinking a lot that people are after her." Dkt. 66-21. Plaintiff was hospitalized on October 19, 2015.

She did not return to work for more than a month, until November 30, 2015. After working for two weeks in December of 2015 and four days of work in January of 2016, Plaintiff sought and obtained two additional weeks of leave. On January 24, 2016, Plaintiff sent Teetsov a letter from

her doctor clearing her to return to work and requesting certain accommodations, including a schedule that would allow her to telework five days a week.  The agency did not grant Plaintiff's request to telework each day of the work week but advised Plaintiff she could telework eight out of the nine days she worked during each pay period.  Plaintiff continued to experience paranoid delusions, felt vibrations, and her doctor remarked in March of 2016 that Plaintiff "is coming to realiz[e] that she wouldn't be able to tolerate any working place."  Dkt. 66-60.  On March 31, 2016, Plaintiff informed Teetsov that she would likely be away from work for at least five days due to an expected hospitalization.

Ten days after being admitted for treatment, on April 10, 2016, Plaintiff expressed doubts about her ability to return to work.  Later, she became noncompliant with her treatment.  On April 19, 2016, Teetsov acknowledged that Plaintiff would be on extended medical leave and asked her to submit medical documentation in support of that leave.  She did not provide any documentation.  That day, April 19, 2016, appears to mark the last day Plaintiff performed any work related to her position, either through a telework capacity or at PARC-WIN's physical office.  On July 27, 2016, PARC-WIN designated Plaintiff with Absent Without Leave ("AWOL") status, and the agency stated to Plaintiff that her absence was "causing an undue hardship on the [a]gency's ability to perform its mission" while also advising Plaintiff of her options, including a request for ongoing accommodations or absence based on her medical condition supported by current medical documentation.  Dkt. 66-54.

Responding to this letter, Plaintiff furnished a letter from her physician supporting her inability to work between March 29 and May 4, 2016; she also requested FMLA leave for August 2016 without supplying any supporting documentation.  In multiple communications to the agency that month, Plaintiff appears to acknowledge she had not submitted the requested documents, at

one point acknowledging the request was "extensive."  Dkt. 66-55.  Then, on August 30, 2016, Plaintiff shared a document dated August 24, 2016, which documented her treatment between August 22-24, 2016, but did not address any of her absences dating back to April of that year.  On September 22, 2016, Teetsov informed Plaintiff that the agency would not grant her leave based on the documentation she had provided.

### 3. Plaintiff's Termination

On July 18, 2017, Teetsov sent Plaintiff a notice detailing her absenteeism since April of 2016.  Teetsov also observed that Plaintiff's excessive absences had no foreseeable end and that the agency wished to fill her position as a procurement analyst on a full-time basis with another individual.  Plaintiff responded, contending that the agency had not adequately communicated with her while she was absent.  She did not provide any requested medical documentation.

On September 22, 2017, the agency removed Plaintiff from her position as a procurement analyst at PARC-WIN and from federal service.  The letter informing Plaintiff of the agency's action advised her that her termination was due to her excessive absenteeism and would be effective October 1, 2017.

### B. Procedural Background

On July 18, 2019, Plaintiff filed a Complaint in the United States District Court for the District of Columbia.  Defendant moved to dismiss that Complaint, and Plaintiff timely filed an Amended Complaint on November 12, 2019.  On September 17, 2020, Judge Dabney Friedrich granted Defendant's renewed motion to transfer venue, ordering the case transferred to the Eastern District of Virginia.  Discovery proceeded in this Court.  In her Amended Complaint, Plaintiff asserts four claims under the Rehabilitation Act of 1973, 29 U.S.C. § 791.  She alleges disability

discrimination, retaliation, hostile work environment, and failure-to-accommodate under that statute.  She also brings a fifth claim under the Telework Enhancement Act, 5 U.S.C. § 6501.

On September 27, 2021, Defendant filed its Motion for Summary Judgment.  Dkt. 65. Plaintiff opposed Defendant's Motion for Summary Judgment on October 12, 2021.  Dkt. 70.  On October 20, 2021, Defendant filed both a reply in support of the Motion for Summary Judgment and sought leave to file a supplement in further support of the Motion.  Dkt. Nos. 74; 75.  The Court granted leave and ordered Plaintiff to file a response to Defendant's supplement.  Dkt. 76. Plaintiff filed her supplemental response on December 15, 2021.  Dkt. 77.

## II.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  "A material fact is one 'that might affect the outcome of the suit under the governing law.'  A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"  *Hantz v. Prospect Mortg., LLC*, 11 F. Supp. 3d 612, 615-16 (E.D. Va. 2014) (quoting *Spriggs v. Diamond Auto. Glass*, 242 F.3d 179, 183 (4th Cir. 2001)).  The moving party bears the "initial burden" of showing that there is no genuine issue of material fact.  *Sutherland v. SOS Intern., Ltd.*, 541 F. Supp. 2d 787, 789 (E.D. Va. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  "Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists."  *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

On summary judgment, a court reviews the evidence in the light most favorable to the non-moving party.  *Tolan*, 572 U.S. at 651; *McMahan v. Adept Process Servs., Inc.*, 786 F. Supp. 2d 1128, 1134-35 (E.D. Va. 2011) (citing *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)).

Here, Plaintiff is the non-moving party and all reasonable inferences are accordingly drawn in her favor.  *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 570 (4th Cir. 2015) (quoting *Tolan*, 572 U.S. at 657).  This "fundamental principle" guides a court as it determines whether a genuine dispute of material fact within the meaning of Rule 56 exists.  *Id.*  "[A]t the summary judgment stage[,] the [court's] function is not [it]self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

A factual dispute alone is not enough to preclude summary judgment.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson*, 477 U.S. at 247-48.  And a "material fact" is one that might affect the outcome of a party's case.  *Id.* at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).  The substantive law determines whether a fact is considered "material," and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248; *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001).  A "genuine" issue concerning a "material fact" arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the non-moving party's favor.  *Anderson*, 477 U.S. at 248.

Rule 56(e) requires the non-moving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *Celotex Corp.*, 477 U.S. at 324.  "An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  And this Court

requires that the non-moving party list "all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute." E.D. Va. Loc. Civ. R. 56(B).

### III.   ANALYSIS

#### A. Statute of Limitations

The Secretary's supplemental brief in support of her summary judgment motion argues that Plaintiff's claims regarding her removal are time barred. Plaintiff counters that her claims are timely. Before turning to the merits of the motion for summary judgment, the Court first considers whether Plaintiff has timely asserted her claims for relief.

Under the Civil Service Reform Act, a federal employee is entitled to appeal "certain serious personnel actions" to the Merit Systems Protection Board ("MSPB" or "the Board"). These personnel actions include removal from federal service. *See* 5 C.F.R. § 353.04. A quasi-independent body, the MSPB adjudicates federal employment disputes. *Perry v. Merit Sys. Protection Bd.*, 137 S. Ct. 1975, 1980 (2017). Discrimination-based employment complaints are also in the MSPB's remit, as the Board is vested with authority to resolve these "mixed cases"— cases that involve both a sufficiently serious employment complaint *and* a discrimination allegation. *Kloechner v. Solis*, 568 U.S. 41, 44 (2012) (citing 29 C.F.R. § 1614.302 (2012)). The MSPB is not the end of the road for an aggrieved federal employee, however; if she receives an adverse decision from the Board, the Civil Service Reform Act then permits her to seek judicial review of the MSPB's decision in a mixed case. *See* U.S.C. § 7703(b)(2) ("Notwithstanding any other provision of law, any such case . . . must be filed within 30 days after the date the individual filing the case received notice of the judicially reviewable action.").

Plaintiff was removed from federal service effective October 1, 2017. She then appealed that removal to the MSPB on December 22, 2017, bringing claims alleging discrimination and

retaliation.  On March 23, 2018, the MSPB issued its final determination, finding that Plaintiff filed her appeal 52 days late and that she had failed to establish good cause for waiving the time limit.  Dkt. 75-3 at 4.  The MSPB dismissed Plaintiff's appeal as untimely, providing that if she sought to seek judicial review of the MSPB's decision, she would have to seek relief in a federal district court by April 23, 2018—thirty days after the MSPB's final determination, as required by 5 U.S.C. § 7703(b)(2).  Dkt. 75-3.  Defendant argues that because Plaintiff did not initiate this action until July 18, 2019, *see* Dkt. 1, her claims are time-barred under § 7703(b)(2).

Plaintiff responds to Defendant's timeliness argument by arguing that although the MSPB "chose not to listen to the case for untimeliness," the matter "was not properly in that forum to begin with."  Dkt. 77 at 3.  Plaintiff contends she "is not seeking judicial review of the [MSPB] dismissal," arguing that her case is not a mixed case subject to MSPB adjudication but instead "finds its origins" in the EEOC complaint she separately brought.  *Id.* at 7.  According to Plaintiff, she timely informed the EEOC that she had been terminated for discriminatory reasons and initiated this case within the applicable statute of limitations.

Anticipating this argument, Defendant counters that Plaintiff cannot argue that her efforts to separately challenge her removal as discriminatory and retaliatory within the jurisdiction of EEOC means that this federal case was timely filed.  Defendant points to the EEOC's January 9, 2020 Order denying Plaintiff's request to amend her EEO complaint to include an allegation that her employment was unlawfully terminated.  Dkt. 75-1 at 2-3 n.1.  In that Order, the EEOC found that it "lack[ed] jurisdiction to adjudicate Complainant's termination claim."  *Id.* (citing Dkt. 66-67).  And according to Defendant, "[t]he deadlines for seeking review of an MSPB determination are not altered by Plaintiff's filing of a complaint with the EEOC, in which her termination-related

claims were dismissed in lieu of her pending MSPB action." *Id.* (quoting *Pendleton v. Saul*, No. CV SAG-20-715, 2020 WL 5517346, at *2 (D. Md. Sept. 14, 2020)).

On this record, the Court concludes that any of Plaintiff's claims related to the MSPB decision are time-barred. When the MSPB denied Plaintiff's request to amend her complaint and issued an Order on March 23, 2018, the Board also put Plaintiff on notice that she had thirty days to seek review in a federal district court. Plaintiff nonetheless delayed taking that action for fourteen months, waiting until July 18, 2019 to bring this federal lawsuit. *See* Dkt. 1. Accordingly, the Civil Service Reform Act precludes relief in this forum to the extent Plaintiff seeks judicial review of any of the MSPB's decisions. 5 U.S.C. § 7703(b)(2) ("Notwithstanding any other provision of law, any such case filed under any such section must be filed within 30 days after the date the individual filing the case received notice of the judicially reviewable action under such section 7702."). Courts in this circuit have held that such delay bars a plaintiff's claims. *See, e.g.*, *Hylton v. Dole*, 818 F.2d 28, 1987 WL 36025, at *1 (4th Cir. 1987) (affirming dismissal of mixed case filed two months late).

For her part, Plaintiff argues that this is not a "mixed case" at all, and her attorney suggests that Plaintiff mistakenly initiated an MSPB appeal while she was unrepresented by counsel. Dkt. 77 at 3. Indeed, the record also shows that Plaintiff filed charges with the EEOC long before her termination and eventual appeal to the MSPB. The record also suggests that Plaintiff waited a significant period of time before receiving a response from the EEOC and that she did not receive a hearing until after her employment was terminated. In light of this unusual procedural posture, the Court must turn to the merits of Plaintiff's claims, notwithstanding its observations on the timeliness of Plaintiff's pursuit of these claims in federal court.

B. Merits

1. Rehabilitation Act Claim for Discrimination and Retaliation (Counts One and Three)

Plaintiff brings two claims under the Rehabilitation Act, one for disability discrimination and another for retaliation.  Summary judgment is appropriate on both counts for the reasons that follow.

To establish a *prima facie* case of discrimination under the Rehabilitation Act, Plaintiff must prove that: (1) she is disabled; (2) she suffered an adverse employment action; (3) she was otherwise qualified for the position; and (4) her employer took adverse action against her solely on the basis of her disability.  *Hannah P. v. Coats*, 916 F.3d 327, 342 (4th Cir. 2019).  Similarly, a *prima facie* showing of retaliation under the Rehabilitation Act demands that Plaintiff establish (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) a causal connection between the protected activity and the adverse action.  *Hooven-Lewis v. Caldera*, 249 F.3d 259, 271 (4th Cir. 2001).  "Because the Rehabilitation Act imposes 'a stricter causation requirement than the ADA,'" a plaintiff can establish causation only if she proves her disability was the "sole" reason for the discriminatory action she challenges.  *Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 750 (4th Cir. 2018) (quoting *Thomas v. Salvation Army S. Territory*, 841 F.3d 632, 641 (4th Cir. 2016)).

The *McDonnell Douglas* burden-shifting framework applies to Plaintiff's Rehabilitation Act claims.  *See Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  Under that framework, if a plaintiff establishes a *prima facie* case of discrimination or retaliation, the burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory, non-retaliatory justification for taking the employment action at issue.  *Hannah P.*, 916 F.3d at 347.  If the defendant meets this burden, the burden then

12

shifts back to the plaintiff, who must demonstrate that the defendant's stated reasons are pretextual. *Id.*; *see also Netter v. Barnes*, 908 F.3d 932, 938 (4th Cir. 2018).

### a. Plaintiff's Prima Facie case of Disability Discrimination

#### i. Whether Plaintiff is Disabled

With respect to the first element, Defendant does not dispute that Plaintiff suffers from a disability, acknowledging that "Plaintiff had a mental health condition that was diagnosed variously as schizoaffective disorder and bipolar disorder" both before and during her employment with the Army Corps of Engineers. *See* Dkt. 66 at 3. The Court therefore finds that Plaintiff satisfies the first element of her *prima facie* case of disability discrimination.

#### ii. Adverse Employment Action

The Court next addresses whether Plaintiff suffered an adverse employment action, an inquiry that bears on other elements of Plaintiff's *prima facie* case. Plaintiff identifies a number a workplace grievances in her Amended Complaint. These include disagreements with Mills-Diggs about work assignments and interpersonal conflicts, *see* Dkt. 7 ¶¶ 22, 28, 30, 33, 46, 49, 98, 103; disputes with Teetsov over work assignments and Plaintiff's requested transfer, *id.* ¶¶ 29, 46, 53, 100, 103; Plaintiff's dissatisfaction with being excluded from meetings, *id.* ¶ 101; Plaintiff's employer's decision to remove her from the Contract Officers Review Board, *id.* ¶ 102; Plaintiff's complaints about the adjudication of her EEO claim, *id.* ¶¶ 42-45, 99; Plaintiff's quarrels with her employer's sick leave policy, *id.* ¶¶ 66, 104; and Plaintiff's ultimate termination, *id.* ¶¶ 80, 105. The vast majority of these events—those that had no measurable effect on Plaintiff's job title or pay—do not constitute adverse employment actions. *See, e.g.*, *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 376-77 (4th Cir. 2004). Fourth Circuit authority makes clear that without

record evidence of any such effect, Plaintiff's workplace grievances are not actionable.[2]  *See, e.g.,*

*Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 243 (4th Cir. 1997) (holding that a less

preferable work assignment, on its own, is not an adverse action); *Terry v. Perdue*, No. 20-2016,

2021 WL 3418124, at *2 (4th Cir. Aug. 5, 2021) ("[A]n employer does not commit an adverse

employment action when it requires an employee to comply with its sick leave policy." (internal

citation omitted)).

By contrast, two of Plaintiff's grievances—her requested transfer and termination—merit

closer scrutiny.  A termination is unquestionably an adverse employment action.  *See Laughlin v.*

*Metro. Washington Airports Auth.*, 149 F.3d 253, 258 (4th Cir. 1998) (citing *Hartsell v. Duplex*

*Prod., Inc.*, 123 F.3d 766, 775 (4th Cir. 1997)).  As for the denial of her requested transfer, a denial

of a transfer amounts to an adverse employment action only if the denial results in materially

adverse consequences affecting the terms, conditions, or privileges of the plaintiff's employment.[3]

*See, e.g.*, *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (providing that a

"decrease in . . . level of responsibility, or opportunity for promotion" may constitute an adverse

---

[2] Plaintiff shared information about her condition with multiple people in her workplace. To the extent Plaintiff argues that she can state a claim under the Rehabilitation Act alleging injury for the disclosure of information that she shared voluntarily, she is mistaken; the law confers no such cause of action.  *See, e.g.*, *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 155 (4th Cir. 2012); *Hannah P.*, 916 F.3d at 340.

Similarly, Plaintiff cannot sue under the Rehabilitation Act over the agency's mishandling of her EEO complaint.  As the Fourth Circuit has held, there is no "implied cause of action permitting a plaintiff to challenge procedural deficiencies in an agency's handling of an EEO complaint."  *Nielsen v. Hagel*, 666 F. App'x 225, 232 (4th Cir. 2016).

[3] This test is transferable across several federal employment discrimination statutes, as "the Rehabilitation Act borrows its standards from the ADA, which borrows its standards from Title VII."  *Simms v. Hagel*, No. 3:14-cv-433, 2015 WL 5020894, at *9 (E.D. Va. Aug. 20, 2015) (stating that "an adverse employment action under the Rehabilitation Act must adversely affect the 'terms, conditions, or benefits of the plaintiff's employment'") (internal citation omitted).

employment action) (quoting *Boone v. Goldin*, 178 F.3d 253, 256-57 (4th Cir. 1999)); *Forgus v. Mattis*, 753 F. App'x 150, 153 (4th Cir. 2018) (citing *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1108 (7th Cir. 2012)); *Call v. Panchanathan*, No. 1:20-cv-260, 2021 WL 4206423, at *7 (E.D. Va. Sept. 15, 2021) (collecting cases); *Kitlinski v. Barr*, No. 1:16-cv-60, 2019 WL 7816853, at *3 (E.D. Va. Apr. 10, 2019) (observing that the "mere refusal to grant a transfer that an employee desires does not qualify as an adverse employment action unless the decision had some significant detrimental effect on the employee"), *aff'd*, 994 F.3d 224 (4th Cir. 2021).  Here, there is no evidence in the record to suggest Plaintiff was denied an increase to her salary or enjoyed less responsibility or opportunities for promotion by remaining at PARC-WIN.  In fact, Plaintiff states that she "made a formal written request of John Teetsov for a job transfer to a job of *an equivalent pay grade*." Dkt. 7 ¶ 65 (emphasis added).  And although Plaintiff alleges that her request went unacknowledged, *id.* ¶¶ 46, 72, Defendant's failure to identify a suitable job transfer is simply not an adverse employment action under the Rehabilitation Act.

### iii. Whether Plaintiff is Otherwise Qualified for the Position

Having concluded that Plaintiff is disabled within the meaning of the Rehabilitation Act and that her termination is an adverse employment action, the Court next determines whether the record on summary judgment could permit a reasonable factfinder to determine that Plaintiff was "otherwise qualified for [her] position."  *Hannah P.*, 916 F.3d at 342.  Whether Plaintiff was "otherwise qualified" turns on whether she could "perform the essential functions" of her position "with or without reasonable accommodation" from her employer.  *See* 42 U.S.C. § 12111(8); *see also Tyndall v. Nat'l Educ. Ctrs. Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994).

The "essential functions" of an employee's position are those "functions that bear more than a marginal relationship to the job at issue."  *Tyndall*, 31 F.3d at 213. "Evidence relevant to

15

whether or not a function is essential includes the employer's judgment, written job descriptions, the work experiences of current and former employees, the amount of time spent performing that function, and the consequences of not requiring the [] employee to perform that function." *Serrano v. Cty. of Arlington*, 986 F. Supp. 992, 1000-01 (E.D. Va. 1997) (citing 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n)(3)).  Plaintiff bears the burden of proving she is a qualified individual with a disability by showing: (1) that she could "perform the essential functions of the job, *i.e.*, functions that bear more than a marginal relationship to the job at issue," and (2) if not, whether "any reasonable accommodation by the employer would enable her to perform those functions." *Tyndall*, 31 F.3d at 213 (internal alteration omitted).

To establish that she is "otherwise qualified," a "plaintiff must do more than demonstrate that her employer's belief is incorrect; plaintiff must present evidence reasonably calling into question the honesty of [her] employer's belief." *Tomasello v. Fairfax Cty.*, No. 1:15-CV-95, 2016 WL 165708, at *11 (E.D. Va. Jan. 13, 2016).   In proving this part of the *prima facie* case, "'[i]t is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996) (quoting *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980)).

The Court is therefore tasked with assessing the honesty of her employer's belief at the time of Plaintiff's termination; more particularly, the Court must determine whether Plaintiff was removed from federal service for "excessive absenteeism."  Dkt. 66-59 at 2.  On this issue, there are no material facts in dispute.  Plaintiff's absences were extensive and erratic in a position that unquestionably demanded at least some consistent, predictable attendance.  She does not dispute this fact in her Opposition and fails to marshal any legal argument that would support a contrary conclusion.  *See generally* Dkt. 70.

The record on summary judgment does not call into question the honesty of Defendant's perception that by September of 2017, Plaintiff was no longer able to perform her job due to excessive absenteeism.  As early as September of 2015, Plaintiff informed Teetsov that she would need to take leave because she was "having a difficult time trying to get things done" while teleworking.  *See* Dkt. 66-48.  She took seven days of leave.  Dkt. 66-4 at 462.  After reporting to work for two days, she experienced more paranoid ideations and advised of her "inability to stay on tasks, poor focus and poor concentration."  Dkt. Nos. 66-20, 66-21.  Plaintiff was then away from work from October 19 to November 30, 2015 due to her hospitalization for her condition.  *See* Dkt. Nos. 66-19; 66-23; 66-50.  Plaintiff completed approximately two weeks of work in December of that year.  Dkt. 66-19.

This pattern continued into the new calendar year.  Plaintiff was only able to work for four days in January of 2016 before requesting two additional weeks of leave, which her employer granted.  Dkt. 66-22.  Upon return, her adjusted work schedule permitted her to telework for eight day of each nine-day pay period.  And still, Plaintiff reported increased stress, advising her physician she felt "more suspicious and anxious" as a result of continued paranoid delusions and vibrations.  Dkt. Nos. 66-30; 66-31.  Then, after failing to report to work for six days, Plaintiff informed Teetsov on March 31, 2016 of her impending hospitalization, which would likely cause her to miss at least five additional days of work.  During that hospitalization, Plaintiff herself acknowledged that "she d[id] not believe she c[ould] return to work."  Dkt. 66-62.  Despite her "remarkable increase in psychotic symptoms," she refused the recommended care for her condition.  *Id.*  By the end of April 2016, Plaintiff had ceased to comply with her medical treatment, and by April 19, 2016, she stopped reporting to work altogether.  Dkt. Nos. 66-28; 66-26.  Plaintiff does not dispute this fact.  Dkt. 70 ¶ 28.

At that time, Plaintiff began an unbroken seventeen-month absence from work, which followed generous use of her employer's leave policy and telework privileges between 2015 and April of 2016, during which time she logged lengthy absences from the office.  Plaintiff's inability to report to work, or even to work remotely in any predictable manner during this drawn-out period, shows that she was simply not "able to meet all of [her position's] requirements in spite of [her] handicap."  *Tyndall*, 31 F.3d at 213.  Plaintiff has not introduced any competent evidence, even in the context of summary judgment, as to whether she was an otherwise "qualified individual" to perform her job when she was terminated.  42 U.S.C. § 12111(8).  She has both failed to establish that she was able to perform her job's "essential functions"—in truth, she was unable to perform *any* of her job's functions at the time she was terminated—and has also not shown that "any reasonable accommodation" would have "enable[d] her to perform these functions."  *Tyndall*, 31 F.3d at 213.  Consequently, Plaintiff has failed to carry her burden of proving she was otherwise qualified to perform her role under the Rehabilitation Act.

### iv. Causation

Finally, the Court determines whether a reasonable factfinder could conclude that Plaintiff was terminated "solely on the basis of her disability."  *Hannah P.*, 916 F.3d at 342.  Under "the Rehabilitation Act's stringent causation standard," a plaintiff asserting disability discrimination must establish that her disability was the only reason for her employer's adverse employment action.  *White v. Virginia Bd. for People with Disabilities*, No. 3:18-cv-360, 2019 WL 413546, at *5 (E.D. Va. Feb. 1, 2019) (citing *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468-69 (4th Cir. 1999)).  For the reasons that follow, Plaintiff cannot satisfy this rigorous standard.

The only causation arguments Plaintiff makes are either generalized, conclusory, or unsupported by the record.  She argues that Defendant ignores the "root cause" and "backdrop" of

her mental illness and absence from work—namely, what Plaintiff characterizes as a "pattern of work sabotage." Dkt. 70 at 15-18. But as the record reflects, Defendant went to great lengths to meet Plaintiff's needs over an extended period of time. Defendant permitted Plaintiff to telework eight out of every nine workdays, allowed her to take multiple extended absences to seek treatment, and permitted her to remain on AWOL status for more than 1,500 hours beginning in July of 2016. But even with those accommodations Plaintiff did not adopt a regular, reliable work schedule. After such a lengthy period of Plaintiff's chronic absenteeism, and with no return to work in sight, Defendant terminated her employment. No reasonable factfinder could conclude that Plaintiff's disability was the sole reason her employer finally took such action.

Instead, the factual record unequivocally shows that Defendant terminated Plaintiff's employment on the basis of her attendance record. This Court found in *Vanyan v. Hagel*, 9 F. Supp. 3d 629, 639 (E.D. Va. 2014), that "legitimate attendance-based reasons" constitute sufficient basis for terminating a consistently absent employee. There, as here, the employee received multiple notices from her employer attempting to remedy her attendance issues. There, as here, the employee was afforded generous leave time. And there, as here, the "plaintiff left work and never came back." *Id.* Invoking this Court's earlier admonition in *Luther v. Gutierrez*, "the Rehabilitation Act does not serve to immunize a disabled employee from discipline in the workplace based on a violation of a valid work rule applied to all employees." 618 F. Supp. 2d 483, 493 (E.D. Va. 2009). By that exact reasoning *Vanyan* concluded that the employee could not show that she was removed solely due to her disability. 9 F. Supp. 3d at 639. The attendance-based reasons for termination in this case are even more acute than they were in *Vanyan*. Instead of an employee carrying AWOL status for 792 hours prior to removal, *cf. id.*, Plaintiff here was carried on her employer's books for more than 1,500 work hours before she was terminated. And

19

this period itself followed years of Plaintiff taking significant leave.  The Rehabilitation Act does not mandate that an employer with a valid, generally applicable attendance rule continue to employ an individual who has been completely absent from work for more than seventeen months and has no foreseeable return date.  "[M]isconduct—even misconduct related to a disability—is not itself a disability, and an employer is free to fire an employee on that basis."  *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 n.3 (4th Cir. 1997) (affirming summary judgment on ADA discrimination claim).

In sum, although Plaintiff has established that she is disabled and that her termination constituted an adverse employment action, she has not shown that she was otherwise qualified for the position or that her employer terminated her employment solely on the basis of her disability. For these reasons, Plaintiff fails to establish a *prima facie* case of disability discrimination under the Rehabilitation Act.

v.  Pretext

Even if she were to establish a *prima facie* case of disability discrimination, Plaintiff could not prevail on this Rehabilitation Act claim because she has not rebutted Defendant's legitimate, non-discriminatory reasons for her termination—mainly, failing to report to work after her liberal use of her employer's leave policy.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).  The record does not support Plaintiff's argument that her removal from federal service was pretextual, and Defendant has satisfied its burden of production on this score.

Notably, Plaintiff has not identified a relevant, similarly situated comparator.  While the Plaintiff identifies another employee, Calvin Phair, who carried leave-without-pay status for a time without being terminated by the Army Corps of Engineers, Plaintiff does not adequately describe how she and Mr. Phair were similarly situated—a prerequisite for inferring she suffered disability

discrimination.  Dkt. 70 at 30.  Furthermore, much of the information about Mr. Phair available to the Court leads to exactly the opposite conclusion.  He was a GS-09 Acquisition Specialist, while Plaintiff was a GS-14 Senior Procurement Analyst; Phair provided "administrative support," Dkt. 74-1, but Plaintiff reviewed contracts awarded with values up to one billion dollars.  *See* Dkt. 66-3 at 48.  Because Phair had "different job responsibilities or circumstances," *Booth v. Cty. Exec.*, 186 F. Supp. 3d 479, 486 (D. Md. 2016), he is not a similarly situated comparator for purposes of Plaintiff's disability discrimination claim.  *See Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (stating that an employee complaining of discrimination and a similarly situated comparator must have the "same supervisor, [be] subject to the same standards and engage[] in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it").

Pointing to Calvin Phair's employment history also does little to bolster Plaintiff's case. Though Phair was on leave for about nine months, Plaintiff remained absent from the office for almost twice that time.  The summary judgment record also lacks any details about *why* Phair was on leave for nine months, with Plaintiff conceding she is unfamiliar with the facts of his situation. Without offering these critical details on summary judgment, Plaintiff is unable to show that she and Phair were "treated differently for the same offense."  *Booth*, 186 F. Supp. 3d at 486.

In the end, Plaintiff contends that her conduct, including her seventeen-month absence from work, must be excused because she suffers from a disability.  But her "conclusory allegations that the decision to terminate [her] was discriminatory do not establish a genuine dispute of material fact as to pretext."  *Gonzalez v. Faithful+Gould, Inc.*, No. 1:17-cv-624, 2017 WL 6559905, at *5 (E.D. Va. Dec. 22, 2017), *aff'd*, 741 F. App'x 961 (4th Cir. 2018).  Summary judgment in favor of Defendant is appropriate on Plaintiff's disability discrimination claim.

*b. Plaintiff's Retaliation Claim*

As a predicate for evaluating this claim, once again, Plaintiff has established that she suffered an adverse employment action when her employment with the Army Corps of Engineers was terminated effective October 1, 2017.  To make a *prima facie* showing of retaliation under the Rehabilitation Act, though, she must also show that she engaged in a protected activity and establish a causal connection between that protected activity and her termination.  *Hooven-Lewis*, 249 F.3d at 272.

Plaintiff engaged in a protected activity when she initiated contact with the Army's Equal Employment Opportunity ("EEO") office.  Dkt. 70 at 12 ¶ 14.  Defendant concedes that she satisfies this part of her prima facie case.  *See* Dkt. 74 at 19.  The last element Plaintiff must satisfy to carry the initial burden of her retaliation claim, then, is causation.

The Fourth Circuit has recently observed that the Rehabilitation Act requires "very little evidence of a causal connection . . . to establish a prima facie case of retaliation."  *Smith v. CSRA*, 12 F.4th 396, 417 (4th Cir. 2021) (quoting *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 127 (4th Cir. 2021)).  A plaintiff can either establish causation by presenting facts sufficient to show "that the adverse action occurred because of the protected activity," *Roberts*, 998 F.3d at 123, or by establishing that "the adverse act bears sufficient temporal proximity to the protected activity." *Id.*

Be that as it may, Plaintiff has failed to sufficiently prove causation on her retaliation claim. Plaintiff does not even attempt to travel either of the "evidentiary routes" available to her, *Smith*, 12 F. 4th at 417, omitting from her summary judgment briefing any legal authority or argument responding to Defendant's position on this point.  *See generally* Dkt. 70.  She therefore concedes the issue.

Even if Plaintiff made the modest showing necessary to establish causation at the *prima facie* stage, though, her retaliation claim could not proceed to trial.  Because the facts on summary judgment definitively establish that Plaintiff cannot satisfy her ultimate burden of proving that her termination occurred "solely by reason of" engaging in a protected activity, 29 U.S.C. § 794(a), no genuine issue of material fact exists as to her retaliation claim.  Plaintiff did not comply with the agency's leave procedures, directly contravening management's requests that she do so; she did not submit leave requests in a timely manner; she did not promptly communicate with her supervisor about her expectations in taking future leave; and she did not report to work for over a year before her termination.  This conduct, not Plaintiff's filing of an EEO complaint more than two years prior, resulted in her removal from federal service in September of 2017.

The Rehabilitation Act does not bar an employer from taking remedial action when faced with an employee who does not follow supervisory instructions, adhere to its sick leave policies, or simply does not report to work—even when the employee plausibly alleges her conduct is connected to her disability.  *See Vannoy v. Fed. Reserve Bank of Richmond*, 827 F.3d 296, 305 (4th Cir. 2016).  Despite her earnest, subjective belief that she was retaliated against, Plaintiff has not shown that her protected activity was the but-for cause of her termination.  *See id.* (holding that an employee's "own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate non-discriminatory reasons for discharge.").  Summary judgment is therefore appropriate on Plaintiff's Rehabilitation Act retaliation claim.

### 2. Hostile Work Environment Claim (Count Two)

Plaintiff also brings a claim alleging she was subjected to a hostile work environment as a result of her disability or participation in a protected activity.  For her Rehabilitation Act hostile work environment claim to survive summary judgment, Plaintiff must prove that a reasonable jury

could find that the alleged conduct she experienced was: (1) unwelcome; (2) based on her disability; (3) sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive work environment; and (4) imputable to her employer. *See Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 495-96 (4th Cir. 2015); *see also Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (en banc).  In other words, a *prima facie* hostile work environment claim is proved when a plaintiff shows "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation and internal quotation marks omitted).  It follows that hostile work environment claims are therefore "based on the cumulative effect of individual acts." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).

Plaintiff's hostile work environment claim fails because the facts simply do not show that the workplace antagonism she experienced was sufficiently severe or pervasive to constitute a hostile work environment.  Courts evaluate whether workplace conduct is severe or pervasive by looking to both the employee's subjective assessment of the treatment and by conducting an objective analysis, which applies a reasonable person standard.  *See Harris*, 510 U.S. at 21. Plaintiff argues that after her team lead, Mill-Diggs, learned of her disability, she "targeted [Plaintiff] in basically every way a supervisor possibly could."  Dkt. 70 at 12 ¶ 14.  In addition, Plaintiff alleges that Mills-Diggs intentionally "slandered" her by calling her "crazy" on multiple occasions and "sabotaged" her work by disinviting Plaintiff from staff meetings.  *Id.* at 9, 15 ¶¶ 7, 18.

Viewing the facts in the light most favorable to Plaintiff, the pattern of conduct she alleges does not amount to objectively severe or pervasive harassment.  Disinviting an employee from a

staff meeting, even when combined with other conduct like refusing to communicate with the employee, does not qualify as sufficiently severe and pervasive to establish a hostile work environment.  Repeatedly calling someone "crazy" is impolite, and a person who lives with a mental health condition would understandably take offense to that remark.  This Court addressed a similar issue in *Pritchard v. Metro. Washington Airports Auth.*, No. 1:18-cv-1432, 2019 WL 5698660, at *11 (E.D. Va. Nov. 4, 2019), *aff'd*, 860 F. App'x 825 (4th Cir. 2021)), when an employee's supervisors described him as "crazy" to co-workers on more than one occasion.  The plaintiff in *Pritchard* brought a litany of complaints, including "that he was excluded or 'disinvited' from meetings or groups"; "was denied access to information"; "was the subject of a false ethics complaint"; faced the elimination of "certain functions from his job scope"; "had information withheld from him"; and "was 'publicly humiliated' when his office was relocated[.]" *Id.* at *5.  Finding that the "harassment [did] not rise above the level of workplace 'slights,' normal workplace disagreements, or managerial judgments about work assignments," *Pritchard* granted summary judgment for the defendant on the plaintiff's hostile work environment claim.  *Id.* at *11.

The Court reaches the same result here, mindful that "even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard." *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008).  Missing from the record is any evidence the workplace mistreatment Plaintiff alleges was "aimed to humiliate, ridicule, or intimidate," which would create an abusive atmosphere. *Jennings v. Univ. of North Carolina*, 482 F.3d 686, 695 (4th Cir. 2007) (en banc).

In addition, to prevail on a hostile work environment claim, Plaintiff must prove that the harassment she alleges is actually connected to her disability or protected activity.  By contrast, the record here shows that Mills-Diggs disparaged other employees, a fact Plaintiff herself has

admitted.  Dkt. 66-45; Dkt. 66-3 at 62.  Furthermore, Plaintiff drafted documents accusing Mills-Diggs and Teetsov of unethical or wrongful behavior, decided to print these documents, and left them on a workplace printer for Mills-Diggs or others to find.  Dkt. 66-47; Dkt. 66-4 at 458; Dkt. 66-6 at 24.  When they did, conflict predictably ensued.  Dkt. 66-4 at 458.  Finally, Plaintiff was complaining to her doctor about Mills-Diggs *before* Mills-Diggs even learned of her disability—and long before Plaintiff engaged in a protected activity.  These facts further undermine any suggestion the workplace hostility Plaintiff perceived was in any way due to her disability status or participation in a protected activity.  For these and the reasons outlined above, summary judgment on Plaintiff's hostile work environment claim is appropriate.

### 3. Failure-to-Accommodate Claim (Count Four)

Next, Plaintiff brings a claim under the Rehabilitation Act alleging her employer failed to accommodate her disability.  A *prima facie* failure-to-accommodate case requires a plaintiff to show that: (1) she suffers a disability; (2) her employer had notice of the disability; (3) she was otherwise qualified to perform the employment position in question with reasonable accommodations; and (4) her employer refused to make such reasonable accommodations.  *Lewis v. Gibson*, 621 F. App'x 163, 164 (4th Cir. 2015).

Defendant is entitled to summary judgment on Plaintiff's failure-to-accommodate claim because Plaintiff has failed to establish her *prima facie* case.  Although there is no question that Plaintiff had a disability or that her employer had notice of it, she has not proved that reasonable accommodations would have made her otherwise qualified to perform the position.  Significantly, in her Opposition, Plaintiff does not contest that she would have continued to miss work even if the agency had granted every accommodation she sought.  Plaintiff acknowledges that her symptoms have rendered her unable to work since March of 2016, at which time her doctor said

she was "coming to the realization that she wouldn't be able to tolerate any working place." *See* Dkt. 70 at 16 ¶ 18; Dkt. 66-60. She also admits she has not received treatment or taken prescribed medicine for her health condition since the middle of 2016. Unfortunately, the record shows that by the time of Plaintiff's termination effective October 1, 2017, her situation had worsened to the point that no reasonable accommodation would have rendered her qualified to perform her role. Summary judgment for Defendant on Plaintiff's failure-to-accommodate claim is therefore appropriate.

Plaintiff's failure-to-accommodate claim also fails for a second reason: her employer did, in fact, grant her a number of reasonable accommodations. When there are several effective options for fashioning a reasonable accommodation, courts do not dictate which accommodation an employer must choose. *See Elledge v. Lowe's Home Centers, LLC*, 979 F.3d 1004, 1011-12 (4th Cir. 2020) ("Provided the employer's choice of accommodation is 'reasonable,' 42 U.S.C. § 12111(8), not even a well-intentioned court may substitute its own judgment for the employer's choice."). Because in many cases "the range of reasonable accommodations is broad," courts review failure-to-accommodate claims where "an employee may be accommodated through a variety of measures" with the understanding that "the employer, exercising sound judgment, possesses 'ultimate discretion' over these alternatives." *Elledge*, 979 F.3d at 1011 (quoting 29 C.F.R. § 1630, App. at 406).

Here, Plaintiff emphasizes that she asked to telework five days a week but that her employer denied her this reasonable accommodation. The summary judgment record, however, shows that Plaintiff was offered—but rejected—five days of situational telework in August and September of 2015. *See* Dkt. 70 at 10-11, 13; Dkt. 66-46; Dkt. 66-4. Then, in January of 2016, when she asked to telework five days a week, her employer responded by offering Plaintiff eight

telework days out of every nine work days.  Although Plaintiff by that time preferred a reasonable accommodation that perfectly matched her request to telework five days a week, she testified that she was able to perform her duties by teleworking four days of week.  Dkt. 66-17 at 226. Furthermore, Plaintiff's alternative work schedule meant she could report for work at PARC-WIN just one day every two weeks.  Because the Rehabilitation Act does not require "an employer to choose any particular reasonable accommodation," no reasonable factfinder could conclude Defendant violated the law by failing to adopt Plaintiff's proposal to a tee.  *See Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1986) (analyzing failure-to-accommodate claim under Title VII and concluding that an employer need not choose a "particular reasonable accommodation").

Nor is there any genuine issue of material fact as to Defendant's failure to seek a work transfer or reassignment for Plaintiff, not removing Mills-Diggs after Plaintiff demanded her removal, or in denying Plaintiffs' FMLA leave request when she did not provide supporting medical documentation for the period in question and disregarded agency efforts to obtain the necessary paperwork.[4]  Questions of law resolve each of these arguments in Defendant's favor. First, Plaintiff cites and this Court has found no controlling precedent suggesting Defendant was obligated to grant Plaintiff's work transfer request.  *See Myers v. Hose*, 50 F.3d 278, 284 (4th Cir. 1995) ("[T]he duty of reasonable accommodation does not encompass a responsibility to provide a disabled employee with alternative employment when the employee is unable to meet the demands of his present position.").  Second, the Rehabilitation Act does not mandate that an employer fire one of its employees to meet the reasonable accommodation demands of another employee.  Third and finally, although Plaintiff argues she provided documentation, the doctor's

---

[4] Plaintiff also cites no precedent suggesting that Defendant was legally mandated to place her on Leave Without Pay ("LWOP") status while awaiting her EEOC hearing.

note she provided related to one narrow stretch of time.  But she requested leave for a far longer

period, and when the agency attempted to obtain documentation for the relevant time period,

Plaintiff responded that she was "waiting" for it and "working on obtaining the documentation."

Dkt. Nos. 66-56; 66-58.  As Plaintiff did not provide medical documentation covering the period

for which she requested FMLA sick leave, she cannot now assert that Defendant failed to engage

in the interactive process or failed to accommodate her.  *See Mullen v. Harvey*, 2010 WL 454489,

at *7 (S.D.W. Va. 2010).

### 4. Telework Enhancement Act Claim (Count Five)

Finally, Plaintiff also bring a claim under the Telework Enhancement Act, arguing that her

rights under the law were violated when Defendant requested "excessive" status updates during

the days that she teleworked.  Dkt. 7 ¶¶ 128-135.  Defendant argues that summary judgment is

appropriate because the United States has not waived sovereign immunity as to these claims and

because the statute does not supply a private right of action.  Dkt. 66 at 12-13.  Plaintiff does not

respond to these claims in her opposition to Defendant's summary judgment motion.  *See generally*

Dkt. 70.

The federal government is immune from suit except where Congress has waived sovereign

immunity.  *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).  When there is not an express waiver, a

federal court lacks jurisdiction to resolve a claim brought against the United States.  *United States*

*v. Sherwood*, 312 U.S. 584, 586 (1941).  The Telework Enhancement Act does not expressly waive

the federal government's sovereign immunity.  *See* 5 U.S.C. § 6501 *et seq.*  Accordingly, Plaintiff's

claims alleging Defendant violated the Telework Enhancement Act by requesting excessive status

updates during her telework dates must be dismissed for lack of subject matter jurisdiction.

Plaintiff also lacks a private right of action under the Telework Enhancement Act.  The statute instead imposes restraints on executive agencies in setting telework policy, requiring that they establish such policies, determine telework eligibility, and notify agency employees of their eligibility.  *See* 5 U.S.C. § 6502(a).  But the law does not establish a statutory right to telework and does not confer a private right of action on agency employees who seek to enforce its provisions.  *See Savage v. Burwell*, No. 15-CV-00791, 2016 WL 4132196, at *3 (D.D.C. Aug. 3, 2016) ("The Act does not guarantee any right to telework. Nor does it suggest any private right of action to enforce its terms.").  For this independent reason, the Court cannot allow Plaintiff's Telework Enhancement Act claim to proceed.

## IV.   CONCLUSION

For these reasons, it is hereby ORDERED that Defendant's Motion for Summary Judgment (Dkt. 65) is GRANTED as to all counts in Plaintiff's Amended Complaint (Dkt. 7).

The Clerk is directed to enter judgment for Defendant pursuant to Federal Rule of Civil Procedure 58, vacate the motions hearing and trial date from the Court's docket, and close this civil action.

It is SO ORDERED.

Alexandria, Virginia
January 6, 2022

_____ /s/ _____
Rossie D. Alston, Jr.
United States District Judge